*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
June 27, 2024

*In re* LAVIGNE, Minors.

Nos. 367689; 367853
Lapeer Circuit Court
Family Division
LC No. 23-013080-NA

Before: YATES, P.J., and BORRELLO and GARRETT, JJ.

PER CURIAM.

In Docket No. 367689, respondent-mother appeals of right the trial court's order assuming jurisdiction over her two minor children, GML and PAL, after a jury found that a statutory basis for jurisdiction existed under MCL 712A.2(b). In Docket No. 367853, respondent appeals of right the trial court's order terminating her parental rights to GML and PAL at the initial dispositional hearing pursuant to MCL 712A.19b(3)(b)(*ii*) and (j).[1] We affirm.

## I. FACTUAL BACKGROUND

Respondent lived with her husband and their young children, GML and PAL. Respondent worked as an educational consultant. She was the family's sole wage earner and was permitted to work remotely from home. Her husband was the parent primarily responsible for the children's care while respondent worked. During an ordinary work day, respondent stayed in her home office while her husband cared for the children, but she assisted her husband with childcare during her scheduled work breaks.

In April 2023, then-five-month-old PAL was extremely fussy, which respondent attributed to discomfort associated with recurring constipation issues. On Friday, April 7, 2023, while in the

---

[1] This Court consolidated respondent's appeals to advance the efficient administration of the appellate process. *In re Lavigne,* unpublished order of the Court of Appeals, entered October 19, 2023 (Docket Nos. 367689 & 367853).

care of respondent's husband, PAL suffered injuries associated with Shaken Baby Syndrome. PAL was examined by a pediatrician, EMS technicians, and emergency room physicians, but the extent of his injuries was not fully appreciated until April 9, 2023. On that morning, PAL appeared to have some sort of seizure. MRI imaging of PAL's head later revealed that PAL had, among other injuries, subdural hematomas and retinal hemorrhages. Treating physicians concluded that PAL's injuries were consistent with nonaccidental abusive head trauma. PAL's injuries left him blind, but the full extent of his neurological damage and cognitive impairments was unclear because of his young age.

Children's Protective Services (CPS) removed GML from her parents' care in April 2023 and temporarily placed her with a relative. PAL was hospitalized for approximately one month. After PAL's discharge, he joined GML in the home of the relative. Both children remained in that relative placement throughout the proceedings. On April 21, 2023, the Department of Health and Human Services (DHHS) petitioned the trial court to remove GML and PAL from respondent's care, take jurisdiction over them, and terminate the parental rights of respondent and her husband at the initial hearing pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), and (j). The petition alleged, among other things, that respondent failed to protect PAL from physical abuse and both children remained at risk of harm because respondent continued to live with, and remain married to, her husband. Respondent demanded a jury trial on the issue of jurisdiction over both children. After petitioner presented its evidence at the adjudication trial, the trial court denied respondent's motion for a directed verdict on the question of jurisdiction, and then the jury found that grounds existed for asserting jurisdiction over the children pursuant to MCL 712A.2(b). During the dispositional phase that ensued, the trial court found that clear and convincing evidence supported termination of respondent's parental rights to her two children under MCL 712A.19b(3)(b)(*ii*) and (j), and that a preponderance of the evidence established that termination of her parental rights was in the best interests of both children.[2] This appeal followed.

## II. LEGAL ANALYSIS

On appeal, respondent challenges the trial court's denial of a directed verdict and the jury's finding of grounds for jurisdiction. Additionally, respondent contends that the trial court erred by finding statutory grounds for termination and deciding that termination was in her children's best interests. We shall address each of these arguments in turn.

## A. JURISDICTION

After the DHHS presented proofs at the adjudication trial, respondent moved for a directed verdict, asserting that a preponderance of the evidence did not support any statutory basis for the trial court's exercise of jurisdiction over the two children. The trial court denied the motion, ruling that there were questions of fact for the jury to resolve. On appeal, respondent similarly contends that the DHHS did not present sufficient evidence to submit the issue of jurisdiction to the jury, so the trial court erred by denying her directed-verdict motion. This Court reviews de novo the trial

---

[2] Respondent's husband voluntarily released his parental rights to both children. He is not a party to this appeal.

court's decision on a motion for a directed verdict. *Galvan v Poon,* 511 Mich 206, 211; 999 NW2d 351 (2023). A directed-verdict motion challenges the sufficiency of the evidence. *Barnes v 21st Century Premier Ins Co,* 334 Mich App 531, 550; 965 NW2d 121 (2020). A directed verdict is appropriate if, after viewing the evidence in the light most favorable to the nonmoving party, the court concludes that the moving party is entitled to judgment as a matter of law. *Id.* If reasonable people could honestly reach different conclusions as to whether the nonmoving party established a claim, the motion for a directed verdict must be denied and the case resolved by the jury. *Id.*

"Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional." *In re Brock,* 442 Mich 101, 108; 499 NW2d 752 (1993). At the adjudicative phase, the issue is whether the trial court may exercise jurisdiction over a child. *Id.* To establish jurisdiction, the petitioner must prove, by a preponderance of the evidence, that a statutory basis for jurisdiction exists under MCL 712A.2(b). *In re SLH*, 277 Mich App 662, 669; 747 NW2d 547 (2008). A preponderance of the evidence means that, when the evidence supporting a proposition is weighed against the evidence refuting the proposition, the evidence in support of the proposition "has more convincing force and the greater probability of truth." *People v Cross,* 281 Mich App 737, 740; 760 NW2d 314 (2008).

According to MCL 712A.2(b), a trial court can exercise jurisdiction over a child whenever

(1) [The child's] parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship [or]

(2) [The child's] home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

The DHHS asked the trial court to take jurisdiction over the children because respondent had failed to protect PAL from respondent's husband's abuse and respondent had neglected the needs of the children, and especially GML's needs. The DHHS offered sufficient evidence in its case-in-chief to permit the jury to address the jurisdictional questions.

A preponderance of the evidence indicated that respondent had failed to protect PAL from a known risk of harm. Respondent worked from home, and her husband was primarily responsible for the children's care. Respondent admitted to the police that she knew her husband was irritated and frustrated with PAL's constant fussing. Respondent acknowledged that, on April 6, 2023, her husband had interrupted her several times throughout the day requesting additional help with PAL. Although respondent took several breaks, she admitted that she did not provide her husband with all the help he requested. On the evening of April 6, 2023, into the early morning hours of April 7, 2023, respondent did not get up with PAL during the night, and it was undisputed that respondent's husband violently shook PAL sometime in the early morning hours of April 7, 2023.

According to respondent's testimony, on the morning of April 7, 2023, her husband pointed out that PAL had been up all night. Despite the notice that there were medical issues related to the child's eyes, respondent did not seek medical attention at that point. On April 7, 2023, respondent called their pediatrician, but this appeared to be for the sole purpose of seeking guidance about the child's constipation issue. Although respondent again contacted the pediatrician regarding PAL's constipation on the morning of April 8, 2023, she did not attend the doctor's appointment later that day or go to the hospital when her husband took PAL there, at the pediatrician's urging, for further testing concerning constipation. As a result, respondent was not available to supply a history, and she did not know what her husband told the hospital personnel, even though respondent was aware of her husband's limited capacity to recall and explain the events.

Additionally, there was evidence of earlier events from which a trier of fact could infer that respondent had notice that the children were unsafe in her husband's care. Detective Greg Hadfield testified that respondent disclosed that, approximately six weeks before the April 2023 events, she saw her husband hold the baby in one arm while trying to shake a bottle to mix formula using the same hand. She reported that these acts caused PAL to shake in her husband's arms. Respondent claimed that she tried to teach her husband that this was not safe, and respondent also disclosed to Detective Hadfield that, on another occasion, she heard PAL screaming throughout the day and all of a sudden, the crying or screaming sounded muffled. When she went to investigate, respondent saw her husband "kind of smothering the child into his chest," which muffled the cries. Moreover, respondent admitted that she knew her husband had little experience caring for newborns. He was not the primary caregiver when their older daughter, GML, was an infant. Respondent also stated that she helped her husband with many tasks because he simply was not capable of managing on his own. Indeed, she helped him navigate his probation matters because he did not understand things. Respondent explained that she was used to helping her husband with these sorts of things and it was "second nature" for her. In June 2023, respondent's husband pleaded no contest to the criminal charge of attempted second-degree child abuse. He also pleaded no contest in this child protective proceeding to allegations that he picked up PAL, who was crying, held the child away from him, and "guessed" that he must have "jostled" the infant.

Viewing the evidence in a light most favorable to petitioner, a rational jury could find that respondent failed to protect her child from a known risk of harm and, as a result, her child suffered serious injuries. Thus, there was sufficient evidence to permit the jury to find a statutory basis for jurisdiction by a preponderance of the evidence. Accordingly, the trial court did not err by denying respondent's motion for a directed verdict.

Respondent draws a distinction between her two children, arguing that even if the evidence could support jurisdiction over PAL, it was insufficient with respect to GML. Respondent suggests that, because GML and PAL were not similarly situated, the doctrine of anticipatory neglect could not support jurisdiction over GML. The anticipatory-neglect doctrine dictates that "how a parent treats one child is probative of how that parent may treat other children." *In re AH*, 245 Mich App 77, 84; 627 NW2d 33 (2001) (citation and quotation marks omitted). Respondent asserts that the doctrine could not support jurisdiction over GML, citing *In re LaFrance,* 306 Mich App 713, 730-731; 858 NW2d 143 (2014), and *In re Kellogg,* 331 Mich App 249; 952 NW2d 544 (2020). But the record reveals that the children were similarly situated. Both children were very young when the petition was filed. PAL was five months old; GML was two years old. Because of their ages, both children were dependent on their caregivers and required substantial care. Both children had

special needs.  GML was developmentally delayed, nonverbal, and recently diagnosed as autistic.  Respondent's husband's abuse of PAL rendered PAL blind and cognitively impaired.  In light of the substantial needs and similarities of PAL and GML, the anticipatory-neglect doctrine furnished statutory grounds for jurisdiction over GML.

## B.  STATUTORY GROUNDS FOR TERMINATION

Respondent next contests the trial court's findings of statutory grounds for termination of her parental rights.  In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence.  *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000).  This Court reviews the trial court's findings for clear error.  MCR 3.977(K).  A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that the trial court made a mistake.  *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's parental rights to PAL and GML pursuant to MCL 712A.19b(3)(b)(*ii*) and (j), which permit termination when

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> * * *
>
> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

Because the petition requested termination of respondent's parental rights at the initial disposition, the trial court was allowed to consider evidence introduced at the trial as well as evidence presented at the dispositional hearing in determining whether there existed clear and convincing evidence of a statutory ground to terminate respondent's parental rights.  See MCL 3.977(E)(3).  The evidence offered at trial established that respondent knowingly left a distressed five-month-old infant in the care of a person with diminished capacity who lacked the experience to care for an infant, and who was already frustrated with the baby.  Moreover, that person had previously demonstrated that he did not respond properly to the child's needs, particularly when the child was persistently crying.  The evidence further demonstrated that in the hours leading up to the severe abuse, respondent did not adequately respond to her husband's request for help, and she did not provide care for the child on the night he was injured because, based on a rotation system, it was not her night to get up with the baby.  That same evidence established that respondent had an opportunity to prevent the injury to PAL, but she failed to do so.

Also, clear and convincing evidence established a reasonable likelihood that the children would suffer injury or abuse if placed in respondent's home. The most compelling evidence that respondent would be unwilling or unable to protect her children from a known risk of harm was her continued relationship with her husband. Respondent knew that he had pleaded no contest to felony child abuse charges, and she acknowledged that he had severely injured their infant son. Despite that knowledge, respondent's actions clearly demonstrated that she did not intend to sever her relationship with her husband.

At the time of the adjudication in August 2023, respondent acknowledged that her husband continued to live in her home. Respondent denied that they were going out in public as a couple, but an investigating detective observed them walking together in their neighborhood. Respondent testified at trial that she had a plan in place to ensure that he moved out of the home. They were awaiting the resolution of his related criminal matter and for him to find employment. Respondent claimed she could not simply "kick him into the streets," even though respondent acknowledged that he had places he could go. When respondent testified on the second day of trial in her case-in-chief, she indicated that they had decided the night before that her husband would move out of the house over the Labor Day weekend, i.e., by September 4, 2023. But, respondent admitted at the disposition hearing on September 13, 2023, that her husband was still living in her home. At that time, respondent asserted that her husband's name was on the lease, so she could not just kick him out.

To be sure, respondent had filed for divorce from her husband, but her conduct related to the divorce similarly demonstrated that she was not truly motivated to separate from him. At trial, respondent testified that she filed for divorce on May 2, 2023, but she admitted that the action had been dismissed in August 2023 because of missing paperwork. Respondent claimed the omissions had been rectified and a motion to reopen the divorce case was pending. But at the September 13, 2023 termination hearing, the divorce action still had not been reinstated and respondent admitted that she did not attend the scheduled hearing on September 11, 2023, to address the status of her divorce action because she did not believe that her attendance was required.

Respondent was also heavily involved in her husband's criminal case. Respondent claimed that, as a mother, she was entitled to be kept apprised of the criminal proceedings, but she was not simply observing the process. Respondent attended her husband's criminal hearings and assisted him in navigating his probation. She helped him complete forms and schedule appointments. This conduct was not simply the course of a concerned parent, but was more akin to one spouse assisting and supporting another. Respondent was not making any meaningful effort to remove a dangerous person from her life and the lives of her children.

Respondent consistently said that she understood her husband could not have contact with the children, but her actions called her credibility into question. The evidence that respondent was unwilling to end her relationship with her husband supports the trial court's determination that the children were likely to suffer injury or abuse in the future if placed in respondent's home. That conclusion is particularly valid in light of testimony from a relative that respondent's husband had planned to resume providing care for the children during the day as soon as they were returned to respondent's care. Accordingly, the trial court did not clearly err by finding clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*ii*) and (j).

## C. BEST INTERESTS

Finally, respondent contests the trial court's finding that termination of her parental rights was in her children's best interests. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). In considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White,* 303 Mich App 701, 713; 846 NW2d 701 (2014). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over a parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id.* at 713-714. Also, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re Van Dalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The trial court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and the parent's history. *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009).

The court should weigh all the evidence available to determine the child's best interests. *In re White,* 303 Mich App at 713. The court's focus must be on the child, not the parent. *In re Moss,* 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id*. at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in the child's best interests. *In re Jones,* 286 Mich App at 129.

Here, the record contains overwhelming evidence that neither child would be safe in the care of respondent. Respondent ignored an obvious risk of harm when she left her infant child in the care of her husband, who was ill-equipped to provide proper and safe care for a helpless infant. Respondent's actions after the abuse revealed that she would permit her children to have continued contact with her husband, even though she acknowledged that he had severely injured her child, leaving the child blind and facing an uncertain future because of neurological damage. There was scant evidence that respondent would put her children's needs ahead of her own. By contrast, the children were thriving in the care of their relative. Both of the children had special needs. PAL required various services to address his vision impairment, feeding issues, and potential cognitive impairments. GML had recently been diagnosed as autistic. The relative was ensuring that both children were consistently participating in occupational therapy, physical therapy, and Early-On services. The relative was also committed to ensuring that GML begin the recommended speech therapy.

Several witnesses testified about the progress that GML had made since she was placed in the care of her relative. When GML was removed from respondent's care, she had an inexplicable and extreme fear of women. She also was nonverbal and had exhibited other cognitive delays. Within a few weeks of being placed with her relative, GML had made tremendous progress. One witness described the change in the child as "amazing." Therefore, the record leaves no doubt that the relative caregiver was ensuring that the children's emotional, medical, and physical needs were being met.

When addressing a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App 35, 42; 823 NW2d 144 (2012). A preponderance of the evidence in this case reveals that the foster home was preferable to the home respondent could provide for the children. Further, the trial court may consider the possibility of adoption. *In re White,* 303 Mich App at 713. In this case, the relative expressed a willingness to adopt the children in her care if the trial court chose to terminate respondent's parental rights.

Respondent faults the trial court for failing to consider each of the children's best interests separately, but the record does not support that argument. When more than one child is involved, a trial court must consider each child's best interests separately. *In re Olive/Metts*, 297 Mich App at 42. Because the children's needs were substantially similar, the trial court addressed their best interests concurrently. A trial court need not make "individual" and "redundant factual findings" if the children's interests do not significantly differ. *In re White*, 303 Mich App at 715-716.

Respondent also argues that the trial court failed to consider that the children's placement with a relative was a factor weighing against termination of parental rights. Although placement with a relative weighs against termination and such a placement must be considered, a trial court may terminate parental rights even if a child is placed with a relative if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. The trial court acknowledged that the children were placed with a relative and that militated against termination, but it went on to properly balance relative placement with other relevant factors. The court noted, among other things, PAL's severe injuries and the continued risk to the children because respondent had not ended her relationship with her husband. The trial court properly balanced relevant factors and did not clearly err by finding that termination of respondent's parental rights was in the children's best interests, despite their placement with a relative.

Affirmed.

/s/ Christopher P. Yates
/s/ Stephen L. Borrello
/s/ Kristina Robinson Garrett